UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON

CIVIL ACTION NO. 09-306-GWU

MORTON LATINE CASADA, PLAINTIFF,

VS. **MEMORANDUM OPINION**

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY, DEFENDANT.

## INTRODUCTION

The plaintiff brought this action to obtain judicial review of an administrative denial of his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The appeal is currently before the court on cross-motions for summary judgment.

## APPLICABLE LAW

The Commissioner is required to follow a five-step sequential evaluation process in assessing whether a claimant is disabled.

1. Is the claimant currently engaged in substantial gainful activity? If so, the claimant is not disabled and the claim is denied.

2. If the claimant is not currently engaged in substantial gainful activity, does he have any "severe" impairment or combination of impairments--i.e., any impairments significantly limiting his physical or mental ability to do basic work activities? If not, a finding of non-disability is made and the claim is denied.

3. The third step requires the Commissioner to determine whether the claimant's severe impairment(s) or combination of

        impairments meets or equals in severity an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the Listing of Impairments).  If so, disability is conclusively presumed and benefits are awarded.

4.      At the fourth step the Commissioner must determine whether the claimant retains the residual functional capacity to perform the physical and mental demands of his past relevant work.  If so, the claimant is not disabled and the claim is denied.  If the plaintiff carries this burden, a prima facie case of disability is established.

5.      If the plaintiff has carried his burden of proof through the first four steps, at the fifth step the burden shifts to the Commissioner to show that the claimant can perform any other substantial gainful activity which exists in the national economy, considering his residual functional capacity, age, education, and past work experience.

20 C.F.R. §§ 404.1520; 416.920; Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984); Walters v. Commissioner of Social Security, 127 F.3d 525, 531 (6th Cir. 1997).

Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence. Jones v. Secretary of Health and Human Services, 945 F.2d 1365, 1368-1369 (6th Cir. 1991).  This "substantial evidence" is "such evidence as a reasonable mind shall accept as adequate to support a conclusion;" it is based on the record as a whole and must take into account whatever in the record fairly detracts from its weight. Garner, 745 F.2d at 387.

One of the issues with the administrative decision may be the fact that the Commissioner has improperly failed to accord greater weight to a treating physician than to a doctor to whom the plaintiff was sent for the purpose of gathering information against his disability claim. Bowie v. Secretary, 679 F.2d 654, 656 (6th Cir. 1982). This presumes, of course, that the treating physician's opinion is based on objective medical findings. Cf. Houston v. Secretary of Health and Human Services, 736 F.2d 365, 367 (6th Cir. 1984); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984). Opinions of disability from a treating physician are binding on the trier of fact only if they are not contradicted by substantial evidence to the contrary. Hardaway v. Secretary, 823 F.2d 922 (6th Cir. 1987). These have long been well-settled principles within the Circuit. Jones, 945 F.2d at 1370.

Another point to keep in mind is the standard by which the Commissioner may assess allegations of pain. Consideration should be given to all the plaintiff's symptoms including pain, and the extent to which signs and findings confirm these symptoms. 20 C.F.R. § 404.1529 (1991). However, in evaluating a claimant's allegations of disabling pain:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

Duncan v. Secretary of Health and Human Services, 801 F.2d 847, 853 (6th Cir. 1986).

Another issue concerns the effect of proof that an impairment may be remedied by treatment.  The Sixth Circuit has held that such an impairment will not serve as a basis for the ultimate finding of disability.  Harris v. Secretary of Health and Human Services, 756 F.2d 431, 436 n.2 (6th Cir. 1984).  However, the same result does not follow if the record is devoid of any evidence that the plaintiff would have regained his residual capacity for work if he had followed his doctor's instructions to do something or if the instructions were merely recommendations. Id.  Accord, Johnson v. Secretary of Health and Human Services, 794 F.2d 1106, 1113 (6th Cir. 1986).

In reviewing the record, the court must work with the medical evidence before it, despite the plaintiff's claims that he was unable to afford extensive medical work-ups.  Gooch v. Secretary of Health and Human Services, 833 F.2d 589, 592 (6th Cir. 1987).  Further, a failure to seek treatment for a period of time may be a factor to be considered against the plaintiff, Hale v. Secretary of Health and Human Services, 816 F.2d 1078, 1082 (6th Cir. 1987), unless a claimant simply has no way to afford or obtain treatment to remedy his condition, McKnight v. Sullivan, 927 F.2d 241, 242 (6th Cir. 1990).

Additional information concerning the specific steps in the test is in order.

Step four refers to the ability to return to one's past relevant category of work. Studaway v. Secretary, 815 F.2d 1074, 1076 (6th Cir. 1987). The plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work. Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983). However, both 20 C.F.R. § 416.965(a) and 20 C.F.R. § 404.1563 provide that an individual with only off-and-on work experience is considered to have had no work experience at all. Thus, jobs held for only a brief tenure may not form the basis of the Commissioner's decision that the plaintiff has not made out its case. Id. at 1053.

Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had. E.g., Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994). One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category if it encompasses a great deal of walking or standing, or when it involves sitting

most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities.  20 C.F.R. § 404.1567(b).  "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing.  20 C.F.R. § 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990).  If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid.  Ibid. In such cases, the agency may be required to consult a vocational specialist. Damron v. Secretary, 778 F.2d 279, 282 (6th Cir. 1985).  Even then, substantial evidence to support the Commissioner's decision may be produced through reliance on this expert testimony only if the hypothetical question given to the expert

accurately portrays the plaintiff's physical and mental impairments.  <u>Varley v. Secretary of Health and Human Services</u>, 820 F.2d 777 (6th Cir. 1987).

## DISCUSSION

The plaintiff, Morton Casada, was found by an Administrative Law Judge (ALJ) to have "severe" impairments consisting of discogenic and degenerative disorders of the back, post traumatic stress disorder, and a history of substance abuse "in remission by report."  (Tr. 17).  Nevertheless, based in part on the testimony of a Vocational Expert (VE), the ALJ determined that Mr. Casada retained the residual functional capacity to perform a significant number of jobs existing in the economy, and therefore was not entitled to benefits.  (Tr. 21-5).  The Appeals Council declined to review, and this action followed.

At the administrative hearing, the ALJ asked the VE whether a person of the plaintiff's age of 44, with marginal literacy and a work history of being a packer and inspector of bathroom fixtures, could perform any jobs if he were limited to "light" level exertion, was limited to simple instructions in object-focused work settings requiring little public contact, and was capable of adapting to routine changes in work settings or work routines.  (Tr. 51-2).  The VE responded that there were jobs that such a person could perform, and proceeded to give the numbers in which they existed in the state and national economies.  (Tr. 52).

7

On appeal, this court must determine whether the hypothetical factors selected by the ALJ are supported by substantial evidence, and that they fairly depict the plaintiff's condition.

Mr. Casada alleged disability due to mental problems and paranoia. (Tr. 125). He stated that he had stopped working full-time on September 21, 2006, the date he had been sent to jail for a probation violation after failing a drug test. (Id.). At the hearing, he testified that he was having difficulty with mental functioning and had to take drugs in order to "feel sort of normal." (Tr. 31, 47-8). He claimed to be having panic attacks, and thought that being sent back to jail might help him with his drug problem. (Tr. 48). He remained in jail approximately eight months. (Tr. 31). At the time of the hearing in October, 2008, he stated that he had attended substance abuse classes and received a diploma, and was now seeing a private psychiatrist, Dr. Bokhari. Dr. Bokhari had told Mr. Casada that he might be depressed or bipolar, but had not yet "decided exactly how many problems I've got." (Tr. 35). However, he described a long history of panic attacks. (Tr. 36). He denied abusing any drugs, whether a prescription medication or some other substance, since his arrest. (Tr. 41-2). He admitted that his treating family physician, Dr. Jonathan Ruby, had dismissed him from his practice for doctor-shopping, but alleged that this was due to an error by his pharmacy. (Tr. 37-40).

The plaintiff does not challenge the ALJ's finding that he was capable of light level exertion. He argues that the ALJ: (1) failed to give proper weight to the

opinions of the treating and consultative psychological sources; (2) improperly relied on the opinions of non-examining state agency medical reviewers; and (3) reached unsupported conclusions about the role of substance abuse without making appropriate findings.

Mr. Casada underwent a consultative psychological examination by Shannon Mahoney, M.Ed., under the supervision of Christopher Catt, a licensed clinical psychologist, on October 1, 2007. Mr. Casada told the examiner that he was struggling with depression and paranoia and hearing voices, and had a long history of substance abuse, including a history of drinking heavily and smoking marijuana in his teens and twenties. (Tr. 197-8). He stated that he had been addicted to prescription pain medication for the past 25 years and that he smoked crack cocaine weekly "on and off" for the past 25 to 30 years. (Tr. 198). He had currently almost completed a substance abuse rehabilitation program, however. (Tr. 197). His daily functioning was limited because he usually stayed in his room and did not come out of the house. (Tr. 198). He did few domestic chores and never did yard work. Mahoney noted that Mr. Casada's clothing was disheveled and his grooming was neglected. (Id.). He had nervous and agitated motor activity, deficiencies in his remote memory, a "distractible" attention span and a depressed mood. (Tr. 199). He claimed to have both auditory and visual hallucinations, although he was somewhat vague about the details. (Id.). His insight and judgment were poor and there were deficits in his decision-making ability. (Tr. 200). His wife confirmed that

he was "paranoid" about her children, who were living with them.  (Id.).  IQ testing showed a full scale score of 56, but the examiner assessed him as functioning in the borderline range due to his level of adaptive functioning.  (Tr. 200-1).

In summary, Mahoney and Catt listed diagnostic impressions of a "schizoid affective disorder" of the depressive type, alcohol and cannabis abuse by history, polysubstance dependence, a paranoid personality disorder, and suspected borderline intellectual functioning.  (Tr. 201).  His current Global Assessment of Functioning (GAF) score was 30.  A GAF score in this range reflects an individual whose behavior is "considerably influenced by delusions or hallucinations," or serious impairment in communication or judgment, or inability to function in almost all areas.  <u>Diagnostic and Statistical Manual of Mental Disorders</u> (4th Ed.--Text Revision), p. 34.  In terms of functional restrictions, Mr. Casada had a "marked" limitation in his ability to understand, remember, and carry out instructions toward the performance of simple, repetitive tasks and to sustain attention and concentration, and "extreme" limitations in his ability to tolerate the stress and pressure of day-to-day employment and to respond appropriately to supervision, coworkers, and work pressures in a work setting.  (Tr. 201-2).

At this point, the evidence was reviewed by Dr. Jane Brake, a state agency psychologist, who concluded that Mr. Casada did not meet the Commissioner's Listing of Impairment (LOI) 12.04 for his medically determinable schizoid affective disorder, LOI 12.08 for his personality disorder or LOI 12.09 for his substance

addiction disorder.  (Tr. 207-19).  Dr. Brake found that Mr. Casada would have "moderate" limitations in a number of areas, including his ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, to interact appropriately with the general public, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to respond appropriately to changes in the work setting.  (Tr. 203-4).  Dr. Brake found his allegations partially credible and noted his claim that he was now clean and sober and attending an intensive outpatient treatment program.  (Tr. 205).  Dr. Brake gave the examining opinion no weight because she felt it was not consistent with the plaintiff's history and current level of functioning, but was not specific about the details.  He was able to understand and recall simple material, concentrate and persist at simple tasks in two-hour segments, function in an object-focused setting requiring little public contact, and adapt to routine changes.  (Id.).

Another state agency reviewer, Dr. Ed Ross, completed a slightly different mental residual functional capacity assessment with different "summary conclusions" on November 15, 2007, but stated that there was no evidence "to reverse Dr. Brake."  (Tr. 221-3).

Approximately ten months later, on August 19, 2008, the plaintiff began treatment with a psychiatrist, Dr. Robina Bokhari, alleging nervousness, anxiety, and isolated behaviors.  (Tr. 276).  Mr. Casada admitted to a history of alcohol abuse as

11

a teenager, as well as to using marijuana and cocaine off and on "until now." (Tr. 277). Dr. Bokhari circled the word "nicotine" on her pre-printed form, and then appeared to write "Quit/but started . . . again few days ago." (Id.). Dr. Bokhari found Mr. Casada's mood to be anxious. She noted his complaints of being unable to sleep or relax, isolated behavior, and apparently having flashbacks to an incident in his childhood in which his mother set the house on fire and he and his siblings had to be rescued by their father. (Tr. 276-7). Dr. Bokhari made a diagnosis of "rule out" chronic post traumatic stress disorder (PTSD) and assigned a current GAF score of 50, reflecting serious impairments. (Tr. 278). She prescribed medications, including Celexa and Zonegran, and requested a copy of laboratory work. At the next office visit, Mr. Casada described continuing panic attacks and some voices. (Tr. 275). Dr. Bokhari added major depression with psychosis to the PTSD diagnosis. (Id.). On the third and last recorded office visit, on September 16, 2008, Mr. Casada reported that he was somewhat better, and did not hear noises as before, but his affect remained anxious. Dr. Bokhari continued the PTSD diagnosis and the GAF of 50. (Tr. 282).

On October 7, 2008, Dr. Bokhari submitted a "Questionnaire As To Mental Residual Functional Capacity" form indicating that Mr. Casada had "extreme" limitations in his ability to interact appropriately with supervisors and coworkers, to accept instructions and to respond appropriately to criticism from supervisors, to demonstrate reliability, to complete a normal work day and work week without

interruptions from psychologically-based symptoms, and to tolerate the ordinary stresses associated with daily work activity. (Tr. 283). He would have a "marked" limitation in his ability to maintain attention and concentration and to understand, remember, and carry out even simple job instructions. The psychiatrist commented that the plaintiff had a history of trauma, emotional issues with low self-esteem, depression, and anxiety. His minimal interaction and self-isolation caused severe impairment in his day-to-day life. (Id.). When these restrictions were presented to the VE at the administrative hearing, he responded that the plaintiff would be unable to work at any type of employment. (Tr. 52-3).

The ALJ refused to give Dr. Bokhari's limitations controlling or significant weight on several grounds. First, he interpreted Dr. Bokhari's handwritten notes as saying that the plaintiff had "snorted [cocaine] again a few days ago." (Tr. 20). In view of what appeared to be continuing substance abuse, the ALJ stated that Dr. Bokhari's report did not distinguish which limitations stemmed from drug abuse versus other mental disorders. (Tr. 23). Additionally, the ALJ cited the improvement in the GAF score from 30 to 50 "showing no more than serious symptoms/limitations as compared to the level of functioning reported by Ms. Mahoney." (Id.). Finally, the ALJ cited the fact that state agency experts had reviewed the claimant's records and found mental limitations exacerbated by polysubstance dependence and found moderate limitations in concentration, ability to interact with the public, and in maintaining attendance. (Id.). The ALJ stated

that, based on the entire record, he was in agreement with the state agency reviewers' determination.

As an initial matter, the court agrees with the plaintiff that the most likely interpretation of Dr. Bokhari's notes is that she wrote that her patient had "started" nicotine a few days before the first appointment rather than that he had "snorted" cocaine (compare the physician's handwriting on the word "started" at Tr. 275). In making a substantial evidence review, the reviewing court must consider the record as a whole and take into account whatever evidence fairly detracts from its weight. The ALJ's interpretation is not impossible, but it does appear unlikely that the psychiatrist would have failed to include a substance abuse diagnosis or recommend any other treatment if the plaintiff had indicated a recent relapse in drug use.[1] However, assuming without deciding that Dr. Bokhari's limitations were properly discounted for the reasons stated by the ALJ, the plaintiff's argument that

---

[1] Since the case is being remanded on other grounds, this is an area which could usefully be given further development. Additionally, there are certain discrepancies in the notes of Dr. Ruby, the treating family physician. The plaintiff testified that he had been dismissed from Dr. Ruby's care because of a mistake by his pharmacy. The ALJ found that Dr. Ruby's notes did not corroborate the allegation. (Tr. 23). Dr. Ruby's office notes are silent as to the reason that he sent a "letter for dismissal" on August 22, 2008. (Tr. 264). The records do not appear to be complete. For instance, on July 6, 2008, Dr. Ruby wrote that he "refilled" the plaintiff's prescription for Lorcet, but there is no previous reference to a Lorcet prescription in the available notes. There is also an electrocardiogram which had been interpreted as showing evidence of an acute myocardial infarction (Tr. 273), which is not mentioned in the office notes either.

the decision was improperly based on the opinions of the state agency sources is well taken.

The Commissioner's regulations do not require the ALJ to give controlling weight to non-examiners, but provide that the state agency psychological sources are experts in the field of disability whose opinions must be considered. 20 C.F.R. §§ 404.1527(f); 416.927(f); Social Security Ruling 96-6p, at 2. In the present case, the ALJ chose to give the state agency sources controlling weight. The Sixth Circuit Court of Appeals has recently found that a controlling hypothetical question that omitted a restriction that a claimant could work for two-hour segments during an eight-hour work day, as here, did not fully convey the limitations found by state agency sources to the VE. Ealy v. Commissioner of Social Security, 594 F.3d 504, 516-17 (6th Cir. 2010). In the present case, regardless of whatever else might be said about the inconsistencies between the findings of Drs. Brake and Ross, and the lack of explanation for these discrepancies, the limitation to no more than two hours of concentration and persistence at simple tasks was not conveyed to the VE. Consequently, the vocational testimony does not represent substantial evidence satisfying the Commissioner's burden at Step 5 of the sequential evaluation process.

Finally, the plaintiff argues that it was improper to find that the plaintiff's limitations were created or exacerbated by substance abuse without first finding disability. The court agrees with the defendant that the language of 20 C.F.R. §§

404.1535 and 416.935 only requires an ALJ to formally evaluate whether substance abuse was a contributing factor material to the determination of disability where the claimant has already been found disabled. In the present case, the ALJ was attempting to discern the reliability of the treating source opinion based on the possibility that the restrictions from other problems were irreparably intertwined with substance abuse. Accordingly, there was no error.

The decision will be remanded for further consideration.

This the 28th day of May, 2010.

Signed By:

*G. Wix Unthank*

**United States Senior Judge**